## JOSEPH A. HALLIHAN
### *vs.*
## MUTUAL LIFE INSURANCE COMPANY OF NEW YORK

Superior Court        Litchfield County        File No. 10221

MEMORANDUM FILED FEBRUARY 27, 1941.

*FitzGerald, Foote & FitzGerald,* of New Haven, for the Plaintiff.

Robinson, Robinson & Cole, of Hartford, for the Defendant.

McEVOY, J. In this action the plaintiff seeks to recover damages by reason of the failure and refusal of the defendant to pay monthly indemnities to him under the terms of two insurance policies issued by the defendant to the plaintiff.

The plaintiff also seeks damages because he claims that, although the policy provided that the payment of premiums would be waived by the defendant during the permanent disability of the plaintiff, yet, while the plaintiff was permanently disabled, the defendant required the plaintiff to pay the premiums; that the plaintiff has paid the premiums and the defendant should reimburse him in the amount of the premiums paid, with legal interest.

Each policy provides as follows:

"BENEFITS IN EVENT OF TOTAL AND PERMANENT DISABILITY BEFORE AGE OF SIXTY.

TOTAL DISABILITY—Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation.

PERMANENT DISABILITY—Total disability shall, during its continuance, be presumed to be permanent: (a) if such disability is the result of conditions which render it reasonably certain that such disability will continue during the remaining lifetime of the insured; or (b) if such disability has existed continuously for ninety days.

WHEN BENEFITS BECOME EFFECTIVE—If, before attaining the age of sixty years and while no premium on this policy is in default, the insured shall furnish to the company due proof that he is totally and permanently disabled as defined above the company will grant the following benefits during the remaining lifetime of the insured so long as such disability continues."

The benefits are then enumerated in detail.

These policies were executed and delivered to the plaintiff by the defendant on May 10, 1926, and on July 12, 1928, respectively.

Thereafter the plaintiff paid the defendant the stated premiums and complied with all the terms of the policies.

In the month of April, 1932, the plaintiff, while still less than 60 years of age, became totally and permanently disabled and due notice of that condition, in accordance with the terms of the policy, was given by the plaintiff to the defendant.

Thereafter, in accordance with the terms of each policy, the defendant paid to the plaintiff the benefits provided in each policy until about January 1, 1939.

Under the terms of the first policy benefits were payable to the plaintiff, during continuous permanent disability, in the sum of $100 per month, increasing after five years and again after ten years of continuous disability and, under the terms of the second policy, the sum of $50 per month during like disability.

The policies also provided that, in the event of total and permanent disability, as defined in the policies, the defendant would waive payment of each premium as it thereafter became due during the disability period.

In accordance with these terms, the defendant thereafter waived all premiums on these policies from April, 1932, up to about January 1, 1939.

About January, 1939, the defendant notified the plaintiff that it would not make further disability payments to him and, thereafter, the defendant required the plaintiff to, and the plaintiff did, pay all of the premiums which would otherwise have been waived under the terms of these policies.

In the pleadings filed by the defendant it is admitted that the plaintiff had paid the premiums within the period of grace provided in the policies and that no premiums are now due.

Upon the trial of this case, and in their briefs, the parties agreed that the pleadings and the evidence present a factual question which is decisive of the merits of this case.

In the briefs each party adopts the statement of the law

as set out in *Ross vs. Equitable Life Assurance Society,* which case was tried and decided in the Superior Court, Fairfield County, as appears in the memorandum filed June 2, 1936, by Jennings, J., and which is to be found in volume 4, Connecticut Supplement, at page 46.

In that case the court was called upon to determine the meaning of the provision, disability which prevented the insured from engaging in any occupation for remuneration or profit, which proof was required by the contract therein alleged.

In that case Judge Jennings remarked that the question did not then appear to have been passed upon in this State but that the general situation was well described in *Prudential Ins. Co. of America vs. Harris,* 254 Ky. 23, 29, 70 S.W. (2d) 949, 952, wherein the court said: "In construing such clauses the authorities are not in accord. They may be roughly divided into three groups. One gives a strict and literal meaning. The other extreme group gives a liberal interpretation, holding the definition to apply to the insured's occupation. The third is the qualified or intermediate construction. . . . There are but few authorities supporting the extreme view that these provisions are literal and mean that the insured shall be rendered helpless. In our opinion such a construction, requiring complete mental or physical inertia, would lead to absurdity, and would be equivalent to a practical denial of recovery of that which the premium was supposed to be buying. There would have to be a living death, where the insured could not even peddle pencils or peanuts on the street. It cannot be thought that either party to the contract contemplated such a condition of indemnity. The intermediate group of authorities gives a more rational and practical construction, one that is consistent with fairness, and holds that such insuring phrases mean a disability that prevents the insured from following any substantial or remunerative occupation, or from doing any labor for which he is fitted or qualified, mentally and physically, and by which he is able to earn a livelihood."

In the *Ross* case citation was made to 98 A.L.R. 740, note i.

The plaintiff is approximately 48 years of age. The plaintiff's health began to fail in 1930. After an operation for appendicitis in November, 1930, he was advised to and did take a vacation in Cuba. From the time of the operation the plaintiff developed a severe pain in his back and this has,

more or less continuously, seriously affected him and it becomes especially noticeable when he has even a slight feeling of weariness.

Beginning in the year 1930 he consulted various doctors and underwent treatments of various kinds in an endeavor to cure himself.

Between 1926 and 1930 the plaintiff earned from $10,000 to $15,000 a year. The plaintiff, and a partner, had been associated in estimating and contracting, and these partners had made approximately $250,000 during their association.

During the early years of the depression the plaintiff sustained financial losses.

When it became apparent to the plaintiff that he was unable to pursue his usual occupation he immediately undertook to restore his health by soliciting the advice of many physicians. Amongst other means he visited the Lahey Clinic in Boston and thereafter thorough examination and diagnosis of him were made.

Since that time he has consulted at least 12 doctors.

He also made trips to Arizona for treatment and climatic benefits and to New Mexico for baths. While on some of these trips X-rays were taken of various parts of his body.

Since 1930, in an endeavor to cure himself and restore his health, the plaintiff has expended, of his own money, between $20,000 and $25,000.

Various physicians advised him to try to restore his normalcy by engaging in some sort of light work which would occupy his mind and divert his thoughts.

In line with this advice, the plaintiff gave up his home in New York, where he had been engaged in business with his associate, and moved to the outskirts of Torrington, Connecticut, from which town he originally came.

While there, amongst other endeavors, he undertook to and for some time did try to play golf. He finally desisted from playing golf for several reasons, one of which was that the defendant had had its investigators watch and inquire about him and his golf playing.

Upon learning of this espionage the plaintiff was upset and,

this feeling, coupled with the weariness which ensued as the result of the golf playing, induced the plaintiff to refrain from further participation in that sport.

In addition to this the plaintiff undertook to do light work in his garden. He desisted from this attempt because he found that exercise for even so short a time as five to ten minutes would cause him to suffer severe pains throughout his body, with accompanying mental depression.

In addition to this the plaintiff experienced severe pains in his arms and throughout various parts of his body and for some years he found no temporary relief from these pains until finally injections were prescribed for him and these injections would temporarily reduce the severe pain and give him partial relief from the severe pains.

Upon the advice of the physician who is now attending him the plaintiff is making preparations to submit himself for further examination and treatment in a Massachusetts hospital.

After the defendant ceased its payment of benefits to the plaintiff on January 1, 1939, then, on or about July 18, 1939, the plaintiff, at the request of the defendant, entered the New Haven Hospital for inspection and observation by various doctors acting on behalf of the defendant.

One of the examining physicians reports, substantially, that pain has been the chief complaint of the plaintiff and that this pain has shifted from at least one region of the body to another and it was characterized by low grade ache or discomfort in the back, which is localized rather indefinitely in the low thoracic region.

Actual physical ailment was difficult to discover except that it appeared that for some time prior to that time there had been a development of low grade osteoarthritis.

One of the conclusions of that examining physician made in his report dated July 18, 1939 (Defendant's Exhibit 2), was that: "It is unlikely that any degree of rehabilitation could be achieved as long as he [plaintiff] is receiving periodic benefits, or entertaining the prospect of future reinstatement. Consequently I strongly advise a lump sum settlement in a case of this type if it can possibly be brought about. There is no doubt that it would ultimately work out for the benefit of the patient although it is difficult to convince him of this.

In my opinion it is highly probable, although not certain, that recovery would take place. There is no reason why this man who is only forty-six should not be able to return to work."

The other physician made a "recommendation" as follows: "The prognosis for successful treatment is extremely poor. It is most unlikely that a lump sum payment would result in disappearance of symptoms and repeated medical reviews will accomplish nothing. The greatest economy of time and money will be obtained by continuing to pay the patient a moderate disability allowance and applying essentially suggested physical treatment to his complaint. He is probably permanently economically disabled, but it may be that if he feels he is being dealt with fairly and his resentment can be overcome in a friendly rapport situation with one physician in whom he has confidence, that he can be gradually encouraged to resume work."

While there was a material discrepancy between the evidence given by physicians offered on behalf of the defendant at the trial and the statements as contained in the reports of these physicians, which are in evidence and which were made in the day and time of their examination of the plaintiff, it might be inferred that the recollections of these witnesses were much clearer in the day and time of the examination than at a subsequent time—especially when it is considered that these physicians are busy men and engaged in making examinations of many people under diverse circumstances.

It will be observed that, in their written reports, these physicians emphasize the effect of the payment of the monthly indemnities by the defendant to the plaintiff.

Upon the trial it appeared that, at the time of these examinations, these physicians then believed that the monthly payments were then being continued and that there had been no break in these payments. The evidence is, of course, not disputed that the defendant made no monthly indemnity payments to the plaintiff after about January, 1939, and that these examinations and interviews of these physicians with the plaintiff occurred in July of 1939. At that time no payments were being made.

From 1932 until January 1, 1939, inclusive, payments had been made uninterruptedly by the defendant to the plaintiff upon the theory that the plaintiff was, within the terms of the

policy, permanently disabled from pursuing any gainful occupation.

While it is true that the two alternatives set out in the policy are such as to induce the belief that, after the payment during a period of 90 days and after the acceptance of the status by the defendant, the presumption is that the plaintiff is permanently disabled within the terms of the policy, yet it would seem that the claim made by the defendant that this is a rebuttable presumption is a fair claim and that claim should be made within the definition under our law.

The purpose in terminating these payments by the defendant and in having the examinations of the plaintiff made by the physicians on behalf of the defendant was to require the plaintiff to prove that he is permanently disabled within the terms of the policy and, on his failure so to do, to suspend and avoid further payments of indemnity.

This purpose was, apparently, made known to the doctors who examined the plaintiff on behalf of the defendant because, not only did they definitely refer to the suppositious payments and their continuance in their reports, but upon the witness stand each seemed to base his conclusion, in part at least, upon the premise that the plaintiff was unconsciously motivated by a desire to have these payments continue. This theory is expressed in this sentence, taken from the brief of the defendant: "Without in any sense questioning the plaintiff's sincerity, it is abundantly clear that the insured's inability to work is based on his subconscious desire to dwell in the protected and sheltered environment created by his neurosis. Any activity which threatens that safety and the discovery that the defendant apparently questioned his disability brought about a subconscious fear that his invalidity could not be maintained."

The difficulty with this conclusion is that no such "protected and sheltered environment" existed. The undisputed and practically admitted conclusion is that, since the onset of this inability in 1930, the plaintiff has continuously and at all times been cooperative and sincere in his desire to relieve himself of the inability and to restore himself to his former physical condition.

It would seem to be the theory of the physicians who examined on behalf of and testified for the defendant that the

plaintiff would prefer to continue to receive the monthly indemnities rather than to be restored to his former condition and to his former ability to earn.

In view of the fact that, before the onset of this malady, the plaintiff and his associate had earned, through their own efforts, about $250,000 and that, at the time of his incapacity, the plaintiff was then possessed of the ability to earn $10,000 to $15,000 a year, coupled with the undisputed fact that, ever since the onset of this malady, the plaintiff has continuously sought a cure and has tried to find out, as definitely as possible, not only what his existing situation was but what steps might be taken to cure himself, and that he has spent $20,000 to $25,000 in that endeavor, it would be difficult to reasonably infer that the plaintiff would prefer to forego all of these physical and financial advantages for the sake of receiving a greatly reduced sum for no effort at all rather than by virtue of his own effort and ability.

Disregarding, for the moment, the continuous and severe pain experienced by the plaintiff, to say nothing of the uncertainty and mental anguish caused by the continuance of this inability, it would seem that the conclusion arrived at by the physicians who testified on behalf of the defendant, after their examination of the plaintiff, bears no real relation to the existing situation nor is it a reasonable or tenable conclusion that the plaintiff would prefer to suffer the agony and misery which he has endured for about ten years and which he is still suffering and enduring rather than to be restored to his former condition of health and of earning ability and confident independence.

In view of the many expedients adopted and tried by the plaintiff in an endeavor to restore himself to a fair mental condition of stability it is difficult to agree with the conclusion arrived at by the defendant that the plaintiff "can concentrate when he desires and subconsciously he does not desire to concentrate if it means that he must return to work."

The suppositious case of "a person who breaks his leg or arm and refuses to have it set" is so far in contrast with or in opposition to the undisputed circumstances of this case that it bears its own refutation.

This comment applies with equal force to the concluding paragraph of the defendant's brief, which is as follows: "To

conclude, on the other hand, that this plaintiff is not totally and permanently disabled is to prescribe medicine—legal medicine perhaps—which will result in his returning to his former occupation with broader opportunities for earning than have heretofore existed and the disappearance of the disability from which he suffers."

The evidence shows that various doctors have suggested to the plaintiff the advisability of his attempting to concentrate and of his attempting to return to work. The evidence equally shows that the plaintiff did undertake to comply with these suggestions, but these attempts, on the plaintiff's part, always resulted in a recurrence of even more severe physical and mental pain than he had previously sustained.

All of the doctors diagnose the plaintiff's case as a perplexing one and the question was seriously discussed as to the real and definite cause of the plaintiff's inability to work, as he had previously done.

One of the difficulties inherent in each diagnosis was the determination of the location and intensity of the plaintiff's physical pain, as objectively indicated, and the mental stress connected with or flowing from this pain.

The defendant seems to stress the claim that the plaintiff's claimed disability is more, unconsciously, mental than physical and that, unconsciously, he resents any attempt to remove him from his present condition and to restore him to his former condition.

It is not definitely claimed by the defendant that there is no physical, as distinguished from mental, disability, but the difficulty of drawing a distinct line of demarcation between the two is emphasized.

In this connection it should be observed that in each policy total disability is defined in the identical words: "any impairment of mind or body."

This phrase is disjunctive since the word "or" is used and not the conjunctive word "and."

It would seem reasonable to conclude that this phrase is sufficiently comprehensive to include impairment of the mind or the body and that, if, therefore, each impairment exists, the combination if the two impairments in undetermined rel-

ative proportions is sufficient to afford the plaintiff the pro-tection of benefit payments for which he has contracted.

This observation would apply with equal force to the de-fendant's claim that "the insured subconsciously enjoyed his invalidism and was loath to return to the world of respon-sibility."

One of the physicians who testified on behalf of the de-fendant stated that "Mr. Hallihan does not wish a lump sum settlement which has been offered and wishes to discover the physical cause of his pain, have it treated and resume work, as he is bored with idleness."

The liability of the defendant is, of course, dependent upon the construction of the meaning of the words as expressed in the policy. Concededly, the defendant drew the policy and used its own words to express its own meaning. In each of these policies permanent disability is defined viz.: "Total dis-ability shall, during its continuance, be presumed to be per-manent; (a) if such disability is the result of conditions which render it reasonably certain that such disability will continue during the remaining lifetime of the insured; or, (b) if such disability has existed continuously for ninety days."

That the disability existed continuously for more than 90 days is conceded. In the view of the matter most favorable to the defendant's claim, it has existed continuously since April, 1932.

It should be observed that under the wording of part (a) it is not incumbent upon the plaintiff to prove beyond a reasonable doubt that such disability actually exists and that it will continue to exist.

The wording of the section is "if such disability is the result of conditions which render it reasonably certain that such disability will continue."

Obviously, the use of the words "reasonably certain" was made with deliberation and upon careful contemplation and consideration. It is essential therefore to construe these words with reference to the interpretation given to similar, or nearly similar, words as found in the policies involved in the litigation of other cases.

"The question as to whether or not a person is permanently

disabled and will, for life, be unable to do any work or conduct any business for compensation or profit is a question of fact for the jury and where there is any competent evidence to sustain such verdict it must stand....The last case cited construes the identical clause contained in the case at bar and follows the great weight of American authority to the effect that it is a question for the jury." *Aetna Life Ins. Co. of Hartford, Connecticut vs. Huffstetter,* 101 Ind. App. 355, 359, 195 N.E. 598, 600.

"The very terms of the policy itself would indicate that the word permanent is not used in the policy in the sense in which the appellant contends it is used, for the policy contains the provision which we have heretofore set out that the company shall have the right at certain times....to have a physical examination made of the insured by its duly appointed medical examiner to determine whether or not the total disability still exists. The provisions of the policy certainly contemplate that the word permanent is not synonymous as used in the policy with the words everlasting or forever but on the contrary the policy recognizes that a condition which at the time is permanent may be changed in time so that 'If the insured shall so far recover as to be able to engage in any occupation or to perform any work for compensation, gain or profit, no further premium will be waived nor monthly income paid.' We see no reason to hold that the word permanent is not used in the policy in its natural and ordinary sense like for instance it is used in speaking of two bridges, describing the one as temporary or transient and the other as having a fixed or permanent nature, but not, of course, intending to convey the idea that the latter bridge will last forever." *New England Mutual Life Ins. Co. of Boston vs. Durree,* 101 Ind. App. 467, 472, 199 N.E. 868, 870.

" 'Total disability does not mean absolute physical disability on the part of the insured to transact any kind of business pertaining to his occupation. Total disability exists, although the insured is able to perform a few occasional acts, if he is unable to do any substantial portion of the work connected with his occupation. It is sufficient to prove that the injury wholly disabled him from the doing of all the substantial and material acts necessary to be done in the prosecution of his business, or that his injuries were of such a character and degree that common care and prudence required him to desist

from his labors so long as was reasonably necessary to effect a speedy cure.' " *Foglesong vs. Modern Brotherhood of America,* 121 Mo. App. 548, 97 S.W. 240, 242, quoting from *Kerr, Law of Insurance* (1902) 386.

The citation just given applies with particular force to the facts in the instant case. Upon the whole evidence it is clearly apparent that the plaintiff did, on numerous occasions, undertake to concentrate on particular phases of work and that this was done by him with a view and an intention on his part to restore himself to normal capacity.

The evidence also clearly shows that, notwithstanding the earnestness with which the plaintiff entered upon each of these attempts, yet it became readily and quickly apparent to him that these attempts tended not only to retard his recovery but to increase and to bring about a recurrence of the physical and mental pain from which he had previously suffered.

Under these circumstances it would seem that his action, in refraining from what was, apparently, an aggravation of his previous condition, indicated a spirit of cooperation coupled with the exercise of reasonable care on the part of the plaintiff.

"The word 'permanent' is the opposite of temporary or transient. It is not a synonym for eternal, endless or lifelong. For example, a contract for permanent employment gives no right to employment for life....Under an insurance policy, a disability is permanent if it will continue for an indefinite period which is likely never to end, even though recovery at some remote or unknown time is possible. But if recovery is reasonably certain after a fairly definite time, the disability cannot be classed as permanent." *Yoffa vs. Metropolitan Life Ins. Co.,* 304 Mass. 110, 23 N.E. (2d) 108, 109.

In a recent New York case the word "permanent" was interpreted as follows: "This does not mean [that] an insured must be utterly helpless; the phrase is not absolute, but relative. At least it means [that] the insured is unable to engage in a remunerative occupation as that phrase is ordinarily understood, or to do work in some profitable employment or enterprise." *Shabotzky vs. Equitable Life Assurance Society,* 257 App. Div. 257, 260, 12 N.Y.S. (2d) 848, 852.

" 'It must have been a matter of common understanding between the parties to such insurance policy that a condition

which at the time appeared to cause total and permanent disability would often improve; and it is very natural to provide in the contract that if that which appeared to be a total permanent disability did improve, the benefits should not be realized. The provision that the benefits should be realized during the continuance of the total disability only does not indicate....that the parties contemplated that the word "permanent" was a synonym of "temporary" in the light of the ....significant fact that the benefits are to be realized upon proof of total disability being furnished rather than upon actual total disability.'" *Medlinsky vs. Metropolitan Life Ins. Co.,* 146 Misc. 855, 857, 263 N.Y.S. 179, 182, quoting from *Ginell vs. Prudential Ins. Co.,* 205 App. Div. 494, 200 N.Y.S. 261.

"The purpose of the ninety days provision is obvious. It is in effect an agreement not that a temporary disability shall be absolutely deemed to be a permanent disability, but that for the purposes of a claim, the insured shall not be held off indefinitely, but if he is at the time of the claim disabled and has then been so for ninety days *immediately preceding,* he shall for the purposes of payment of the annuity be deemed to be permanently disabled, but only of course so long as the disability lasts." *Thorne vs. State Mutual Life Assurance Co.,* 13 N.J. Misc. 271, 272, 177 Atl. 665, 666.

Upon all the evidence the conclusion seems inescapable that the plaintiff has established the material allegations of his complaint by a fair preponderance of the evidence and that he is entitled to recover. The plaintiff seeks to recover damages for the indemnity instalments which were withheld from him beginning January 1, 1939, and which are still being withheld. He also seeks damages for the recovery of the premium instalments which he has been required to pay since January 1, 1939, and which were no longer waived by the defendant as they previously had been since July, 1932, to January 1, 1939.

Obviously the plaintiff: is entitled to recover interest upon the sums withheld from him.

The rule for the computation of interest upon instalments is found in Kirby's Reports, page 49. Counsel should, as expeditiously as possible and, of course, without prejudice, compute and agree upon the sums due and the interest claimed

to be due and submit these figures as a basis for judgment to be entered in favor of the plaintiff in this case.